UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 20-9414-GW-PVCx | Date | June 3, 2021 |
|---|---|---|---|
| Title | *Clifton Johnson v. Allstate Northbrook Indemnity Company, et al.* | | |

Present: The Honorable   GEORGE H. WU, UNITED STATES DISTRICT JUDGE

| Javier Gonzalez | Terri A. Hourigan | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

Attorneys Present for Plaintiffs:  Attorneys Present for Defendants:

James L. Noble   Scott R. Sveslosky, by telephone

**PROCEEDINGS:** **DEFENDANT ALLSTATE NORTHBROOK INDEMNITY COMPANY'S MOTION FOR SUMMARY JUDGMENT [21]**

   The Court heard oral argument on Defendant's Motion for Summary Judgment and, prior to said argument, copies of the Court's tentative ruling (attached hereto) were provided to counsel. For the reasons stated in the tentative ruling and at the hearing, the Court GRANTS summary judgment in favor of the Defendant.

: 15

Initials of Preparer   JG

***Johnson v. Allstate Northbrook Indem. Co.***, Case No. 2:20-cv-09414-GW-(PVCx)
Tentative Ruling on Motion for Summary Judgment

I. **Background**

    Defendant Allstate Northbrook Indemnity Co. ("Defendant") moves for summary judgment in this action Clifton Johnson ("Plaintiff") originally filed in Los Angeles County Superior Court on September 2, 2020, and removed to this Court on October 14, 2020 on the basis of diversity jurisdiction. The operative pleading in the action, the First Amended Complaint for Damages filed November 18, 2020, *see* Docket No. 11, presents a single claim for relief for breach of implied obligation of good faith and fair dealing ("bad faith").

    Defendant makes several arguments in support of its motion, including that Plaintiff suffered no economic damages; a genuine dispute existed regarding the value of Plaintiff's claim; Defendant did not unreasonably delay in its investigation of, or paying out on, Plaintiff's claim; and that Plaintiff's failure to provide a signed medical authorization and non-compliance with his contractual obligations under the relevant policy preclude his bad faith claim. In addition, Defendant seeks summary adjudication with respect to Plaintiff's pursuit of punitive damages, arguing that Plaintiff lacks clear and convincing evidence to support such a recovery or any evidence of ratification by an officer, director or managing agent of Defendant.

    Based on the briefing and the factual record, the Court reaches only the issue of whether Plaintiff suffered a sufficient threshold financial/economic loss.

II. **Discussion**

    A. **Summary Judgment Standard**

    Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Miranda v. City of Cornelius*, 429 F.3d 858, 860 n.1 (9th Cir. 2005). To satisfy its burden at summary judgment, a moving party without the burden of persuasion "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000) (emphasis added); *see also Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (*en banc*) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the

1

nonmoving party's case.'") (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), and citing *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000)); *Fairbank*, 212 F.3d at 532 (holding that the *Celotex* "showing" can be made by "pointing out through argument…the absence of evidence to support plaintiff's claim").

> If the party moving for summary judgment meets its initial burden of identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact, the nonmoving party may not rely on the mere allegations in the pleadings in order to preclude summary judgment[, but instead] must set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial.

*T.W. Elec. Serv., Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987) (internal citations and quotation marks omitted).

The opposing party must "cit[e] to particular parts of materials in the record" or show that the materials the moving party cited do not establish the absence of a genuine dispute. Fed. R. Civ. P. 56(c)(1); *see also* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."); Phillips & Stevenson, RUTTER GROUP PRAC. GUIDE, FEDERAL CIV. PRO. BEFORE TRIAL (The Rutter Group 2020) ("Phillips & Stevenson"), ¶¶ 14:101.10-101.12, 14:102. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Generally-speaking, in judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence, and views all evidence and draws all inferences in the light most favorable to the non-moving party. *See T.W. Elec.*, 809 F.2d at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)); *Motley v. Parks*, 432 F.3d 1072, 1075 n.1 (9th Cir. 2005) (*en banc*); *Miranda*, 429 F.3d at 860 n.1.

In addition, under this Court's Local Rules, where the moving party on a motion for summary judgment has "claimed and adequately supported" material facts, those facts "are admitted to exist without controversy except to the extent that such material facts are (a) included in the 'Statement of Genuine Disputes' [described in Local Rule 56-2] and (b) controverted by declaration or other written evidence filed in opposition to the motion." *See* C.D. Cal. L.R. 56-3; *see also Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1058 (9th Cir. 2009) ("The 'party opposing summary judgment must direct [the court's] attention to specific, triable

facts,' and the reviewing court is 'not required to comb through the record to find some reason to deny a motion for summary judgment.'") (quoting *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003) and *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001)); *Carmen*, 237 F.3d at 1029 ("[W]hatever establishes a genuine issue of fact must *both* be in the district court file *and* set forth in the response."). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *See National Steel Corp v. Golden Eagle Ins. Co.*, 121 F.3d 496, 502 (9th Cir. 1997); *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir.1979); *see also* Phillips & Stevenson ¶ 14:171.

  **B. Evidentiary Objections (Docket No. 28-2)**

    1. Declaration of Frederick J. Fisher  (Docket No. 26-2)

1. Sustain.
2. Sustain.
3. Sustain.
4. Sustain as to "after they received the initial demand and medical authorizations in early 2018," otherwise overrule.
5. Overrule.
6. Sustain as to "Allstate never even offered the lowest of their own internal evaluations," otherwise overrule.
7. Sustain.
8. Sustain.
9. Sustain.
10. Overrule.
11. Sustain.
12. Overrule.
13. Sustain.
14. Overrule.
15. Sustain as to first sentence, otherwise overrule.
16. Overrule.
17. Overrule.
18. Overrule.

19. Sustain as to first and fourth sentences, otherwise overrule.

    2. <u>Declaration of Rickey Ivie</u> (Docket No. 26-4)

20. Sustain.

21. Sustain as to first and third sentence, overrule as to second sentence.

22. Sustain beginning "unreasonably" and ending with "finally," otherwise overrule.

23. Sustain as to "unreasonably delayed," otherwise overrule.

24. Sustain as to "acted in bad faith by failing" and entirety of second sentence, otherwise overrule.

25. Sustain as to second sentence, otherwise overrule.

26. Sustain as to "Because Allstate was delaying in scheduling the arbitration" in first sentence and "a delay of" and "finally" in second sentence, otherwise overrule.

27. Sustain.

    3. <u>Declaration of Clifton Johnson</u> (Docket No. 26-1)

1. Sustain.
2. Sustain.
3. Sustain.
4. Sustain.
5. Overrule.
6. Sustain as to "unreasonable," otherwise overrule.
7. Overrule.
8. Sustain.
9. Sustain.

    4. <u>Declaration of James Noble</u> (Docket No. 26-3)

1. Sustain.
2. Sustain.
3. Sustain.
4. Sustain.

**C. Background Facts**

Defendant issued an automobile insurance policy to Plaintiff which provided $50,000 per person in uninsured motorist ("UM") coverage for the period September 29, 2016 to March 29, 2017. *See* Allstate's Separate Statement of Uncontroverted Facts and Contentions of Law in

Support of its Motion for Summary Judgment ("SSUF")[1], Docket No. 21-4, ¶ 1. The policy issued to Plaintiff provides, in **Part VI Uninsured Motorists Insurance Coverage SS**: **Proof of Claim; Medical Reports**, that:

> As soon as possible any person making [a] claim must give **us** written proof of claim. It must include all details **we** may need to determine the amounts payable. **We** may also require any person making [a] claim to submit to questioning under oath and sign the transcript.
>
> The insured person may be required to take medical examinations by physicians **we** choose, as often as **we** reasonabl[y] require. **We** must be given authorization to obtain medical reports and copies of records.

*See id.* ¶ 112; *see also* Docket No. 22-2, at P000040, P000043.

On November 5, 2016, an uninsured motorist rear-ended Plaintiff's vehicle, as it was stopped at a red light, in a two-car collision in Los Angeles, California. *See* SSUF ¶ 4; Allstate's Response to Plaintiff's Separate Statement of Disputed Material Facts ("AR"), Docket No. 28-1, ¶¶ 1-2. Airbags did not deploy, and Plaintiff's vehicle suffered minor-to-moderate damage. *See* SSUF ¶ 5. At the time of the collision, Plaintiff was undergoing treatment for stage four prostate cancer. *See* AR ¶ 4.

On November 16, 2016, Plaintiff contacted Defendant to report the accident. *See* SSUF ¶ 6; AR ¶ 5. During a phone call that day, Plaintiff told Defendant that he was experiencing neck and back pain from the accident. *See* SSUF ¶ 7.

On November 18, 2016, Defendant acknowledged Plaintiff's claim and notified him of his vehicle repair and rental rights. *See id.* ¶ 8. From November 2016 through January 2017, Defendant worked with Plaintiff to have his vehicle repaired – ultimately to his satisfaction. *See id.* ¶ 9.

On January 13, 2017, Plaintiff told Defendant that he still had some pain, but that it was "not major." *See id.* ¶ 10. Plaintiff also said that he had back surgery in the past and that the accident may have aggravated his injuries, and asked that Defendant call back in a week to

---

[1] Plaintiff did not file a response to Defendant's SSUF. Instead, he filed only a Separate Statement of Disputed Material Facts Which Preclude Summary Judgment. *See* Docket No. 27. Presenting an entirely separate set of facts without responding to the proposed set of facts introduced by the movant obviously does not ease the process of determining whether there are, in fact, factual disputes key to determining whether summary judgment is or is not appropriate, and is arguably in violation of Local Rule 56-2. As a result, the factual assertions Defendant made in the SSUF are undisputed, except to the extent the paragraphs in Plaintiff's Separate Statement of Disputed Material Facts Which Preclude Summary Judgment both: 1) clearly demonstrate a dispute as to one of the factual propositions set forth in Defendant's SSUF and 2) are based on at least some evidence that the Court does not exclude pursuant to Defendant's evidentiary objections.

discuss in more detail. *See id.* On January 17, 2017, Defendant called and left a voicemail message with Plaintiff, who never returned the call. *See id.* ¶ 13.

On January 15, 2017, Defendant sent a letter to Plaintiff acknowledging his uninsured motorist claim, requesting a list of medical providers that he had seen or planned to see, and requesting that he complete and return an enclosed medical authorization release form. *See id.* ¶ 11. Defendant's files do not show that it ever received a signed medical authorization form from Plaintiff. *See id.* ¶ 12.

On February 7, 2017, Plaintiff visited his primary care physician, Dr. Ornelas. *See id.* ¶ 14. In his February 7, 2017 report – which Plaintiff's counsel did not provide until over a year later, on February 14, 2018, as an exhibit to his letter of that date to Defendant – Dr. Ornelas stated that Plaintiff developed neck pain and left upper extremity paresthesias, diagnosed Plaintiff with: 1) cervical radiculopathy, 2) cervical degenerative disk disease, 3) cervical spondylosis, and 4) lumbar degenerative disk disease, spondylosis and radiculopathy, and prescribed physical therapy. *See id.* ¶¶ 15, 17. That same day, Plaintiff told Defendant that he had seen his doctor. *See id.* ¶ 16.

On February 15, 2017, Plaintiff's counsel sent a notice-of-representation letter to Defendant. *See id.* ¶ 20. On March 3, 2017, Defendant spoke with Plaintiff's counsel's office and was told that they would follow up with their client and get back to Defendant. *See id.* ¶ 21. That same day, Defendant sent a letter to Plaintiff's counsel asking for a demand package and notifying counsel that they would follow up on Plaintiff's medical bills and records. *See id.* ¶ 22.

From February 17 through April 25, 2017, Plaintiff participated in physical therapy. *See id.* ¶ 18. The physical therapist's May 3, 2017 discharge note stated that Plaintiff had "met all goals set at initial evaluation." *See id.* Plaintiff's counsel did not provide the physical therapist's records until February 14, 2018, when he enclosed them as an exhibit to his letter of that date to Defendant. *See id.* ¶ 19.

On April 17, 2017, Defendant sent a letter to Plaintiff's counsel, stating that it was still waiting for information regarding his client's injury and treatment. *See id.* ¶ 23. On May 6, 2017, Defendant sent Plaintiff's counsel another letter, again stating that it was still waiting for this information. *See id.* ¶ 24.

On June 1, 2017, Defendant called and left a message with Plaintiff's counsel's office to inquire and get a status update. *See id.* ¶ 25. That same day, Defendant sent a letter to Plaintiff's

counsel, asking that Plaintiff complete an enclosed Medicare Authorization form. *See id.* ¶ 26. It also sent a letter to Plaintiff's counsel that day requesting all pertinent liability and damage documentation and a list of medical providers that Plaintiff had or planned to see. *See id.* ¶ 27. In addition, Defendant sent a letter to Plaintiff's counsel that same day enclosing a Notice of Claim form for Plaintiff to complete, sign and return. *See id.* ¶ 28. Defendant's files do not show that Plaintiff or his counsel ever returned to Defendant the Medicare Authorization form, the medical authorization form, or the Notice of Claim form. *See id.* ¶ 29.

On July 10, 2017, Defendant sent a follow-up letter to Plaintiff's counsel. *See id.* ¶ 30. On July 24, 2017, Defendant called and spoke with counsel, who said she was unsure if Plaintiff continued to receive medical treatment. *See id.* ¶ 31.

Defendant sent follow-up letters to Plaintiff's counsel, again inquiring as to the status of Plaintiff's injury and treatment, on August 3, 2017, September 5, 2017, and October 2, 2017. *See id.* ¶¶ 32-34. Defendant did not receive a response from Plaintiff's counsel to any of these inquiries. *See id.* ¶ 35.

On October 10, 2017, Defendant sent a letter to Plaintiff's counsel stating that, to resolve Plaintiff's claim, Defendant needed to know how much Medicare had paid for his injury, and advised that Medicare would not release that information without his permission. *See id.* ¶ 36. Defendant enclosed a Medicare Consent release form and asked that Plaintiff sign and return it. *See id.* Defendant's files do not show that Plaintiff ever signed and returned the Medicare Consent release form enclosed with that letter. *See id.* ¶ 37.

On October 30 and November 24, 2017, Defendant again sent follow-up letters to Plaintiff's counsel. *See id.* ¶¶ 38-39. On December 6, 2017, Defendant called Plaintiff's counsel and left a message regarding the status of their demand. *See id.* ¶ 40. On December 28, 2017, it sent yet another follow-up letter to Plaintiff's counsel. *See id.* ¶ 41. Defendant's files do not show that Plaintiff's counsel ever responded to the October 30, November 24 or December 28, 2017 letters, or to the message left for Plaintiff's counsel on December 6, 2017. *See id.* ¶ 42.

On January 19, 2018, Defendant called and left yet another message with Plaintiff's counsel requesting an update. *See id.* ¶ 43. On January 23, 2018, Defendant received a call from Plaintiff's counsel, who said that they were preparing the demand package. *See id.* ¶ 44. On January 29, 2018, Defendant sent a follow-up letter to Plaintiff's counsel. *See id.* ¶ 45. That same day, Defendant received a notice of lien from Medicare for $3,017.34. *See id.* ¶ 46.

Medicare's notice enclosed a payment summary form, identifying the medical providers who had treated Plaintiff.  *See id.*

On February 14, 2018, Plaintiff's counsel sent a demand letter to Defendant, presenting his initial demand that Defendant pay $20,000 by February 26, 2018.  *See id.* ¶¶ 47-48; AR ¶¶ 7, 23; *see also* Docket No. 26-4, Exh. A.  Along with that letter came Plaintiff's medical records, a summary of the accident and Plaintiff's injuries, Dr. Ornelas's report and reports and billing records from Plaintiff's physical therapist, totaling $9,860.08.  *See* SSUF ¶¶ 48, 50; AR ¶ 40.  The letter did not include billing records from Dr. Ornelas, and instead identified a Medicare payment of $3,017.34.  *See* SSUF ¶ 51.  In the letter, Plaintiff's counsel also said, for the first time, that Plaintiff was being treated for stage-four prostate cancer and that his injuries from the accident aggravated his preexisting condition and amplified the pain he experienced from chemotherapy.  *See id.* ¶ 49.

Defendant received the February 14, 2018 letter and enclosed records on February 20, 2018.  *See id.* ¶ 52.  Defendant acknowledged the letter that day, requested Dr. Ornelas's billing records and Medicare lien information from Plaintiff's counsel, and said that it would conduct an initial evaluation.  *See id.* ¶ 53.  That same day, Defendant prepared an assessment of the bills that Plaintiff's counsel submitted and verified that Medicare had paid Plaintiff's physical therapist $2,482.82 and that the physical therapist had written-off $7,369.40, leaving a balance of $7.86.  *See id.* ¶ 54.

Plaintiff has submitted evidence that on or about the day *before* Defendant received Plaintiff's settlement demand – *i.e.*, February 19, 2018 – adjuster Mitchell Cross confirmed receipt of the demand letter and informed Plaintiff's counsel that Defendant had what it needed to evaluate the claim.  *See* AR ¶¶ 8, 24, 38-39.  Still, on February 21, 2018, Defendant told Plaintiff's counsel that it could not accept or reject the February 14, 2018 settlement demand because it still needed billing records for Dr. Ornelas and the physical therapist.  *See* SSUF ¶ 55.  On March 1, 2018, Defendant called Plaintiff's counsel to follow up on the request for the billing records.  *See id.* ¶ 56.  On March 6, 2018, Plaintiff's counsel sent Defendant the January 29, 2018 Medicare Notice – a document that Defendant had already received more than a month earlier.  *See id.* ¶ 57.

On March 13, 2018, Defendant sent a letter to Plaintiff's counsel requesting medical records for the treatment that Plaintiff received from a number of medical providers – Keck

Hospital, Joel Levine, C. Ornelas, and Jason Bang. *See id.* ¶ 58. On March 15, 2018, Defendant sent Plaintiff's counsel a follow-up letter. *See id.* ¶ 59.

On March 28, 2018, Plaintiff's counsel's office contacted Defendant and asked for a response to the settlement demand. *See id.* ¶ 60. Defendant explained in response that day that it could not accept or reject the demand because it had not received the treatment records for the treatment identified in the Medicare Notice, but Plaintiff's counsel's office said that they did not have the requested records. *See id.* ¶ 61.

On April 2, 2018, when Plaintiff's counsel called Defendant and again wanted to know the status of the settlement, Defendant informed counsel that it was still waiting on treatment documents. *See id.* ¶ 62. On April 4, 2018, Defendant left a message with Plaintiff's counsel, reiterating what it still needed to evaluate Plaintiff's claim. *See id.* ¶ 63.

On April 12, 2018, Defendant spoke with Plaintiff's counsel, who expressed confusion about what it was that Defendant needed. *See id.* ¶ 64. Defendant went through the Medicare Notice line-by-line with Plaintiff's counsel. *See id.* Plaintiff's counsel said that they could not obtain the requested records or bills. *See id.* When Defendant responded that it could make the request if Plaintiff's counsel provided the authorization form, he agreed to do so. *See id.* That same day, Defendant emailed Plaintiff's counsel a medical authorization form and asked that Plaintiff sign and date it. *See id.* ¶ 65. The next day, April 13, 2018, Defendant sent letters to Plaintiff's counsel again requesting that Plaintiff sign, date and return the medical authorization form and explaining that Defendant was waiting for the signed authorization form in order to obtain the missing bills and records for evaluation. *See id.* ¶¶ 66-67. Defendant's files do not show that Plaintiff ever returned the signed authorization form to Defendant. *See id.* ¶ 68.

On April 26, 2018, Plaintiff's counsel sent a letter to Defendant enclosing medical records and explaining the basis for the charges that appeared on the Medicare Notice. *See id.* ¶ 69. On April 27, 2018, Defendant called and left a voice message with Plaintiff's counsel to follow up on the needed medical authorization form. *See id.* ¶ 70.

On May 3, 2018, Plaintiff's counsel contacted Defendant and said that he would like an offer by May 17, 2018, based on the information provided. *See id.* ¶ 71. On May 14, 2018, Defendant updated its assessment based on the records received to reflect that Medicare had paid $3,621.14 of the $22,129.85 billed as payment in full, with the providers writing-off the balance (with the exception of the physical therapist, which had a balance of $7.86). *See id.* ¶ 72.

On May 15, 2018, Defendant's adjuster evaluated Plaintiff's claim. *See id.* ¶ 73. The adjuster noted that Plaintiff visited his primary care provider three months after the loss, that he had physical therapy with goals met, that while an epidural injection was performed there were no records associated with the procedure and he could not confirm whether or not it was related to the accident, and that review of the Medicare lien showed treatment unrelated to the accident. *See id.* On May 16, 2018, Defendant's evaluation consultant reviewed the evaluation and agreed with the adjuster's analysis. *See id.* ¶ 74. She noted that the injections were not related to the accident, and assessed a general damages range of $3,200 to $4,200. *See id.* That same day, Defendant's adjuster revised his assessment, concluding that the claim had a value range of $6,321 to $7,321. *See id.* ¶ 75.

On May 16, 2018, Defendant sent a letter to Plaintiff's counsel conveying an offer of $6,821.14 to settle Plaintiff's claim. *See id.* ¶ 76; AR ¶¶ 9, 25. On May 17, 2018, Plaintiff's counsel left a voicemail message with Defendant, stating that Plaintiff rejected the offer, and requesting the policy wording for requesting arbitration. *See* SSUF ¶ 77. That same day, Defendant spoke with Plaintiff's counsel, who asked Defendant for the basis for the settlement offer. *See id.* ¶ 78. Defendant provided the basis – delay in treatment, injections that did not appear accident-related, and physical therapy focusing on the lower back, rather than the cervical spine. *See id.* Plaintiff's counsel did not provide Defendant with additional information bearing on the analysis, but instead said that they would demand arbitration. *See id.* On June 7, 2018, Plaintiff made a formal demand for UM arbitration. *See id.* ¶ 79; AR ¶ 10.

On September 12, 2018, Defendant's staff counsel sent a letter to Plaintiff's counsel accepting Plaintiff's arbitration demand and serving written discovery. *See id.* ¶ 80; AR ¶ 29. On October 26, 2018, Plaintiff responded to Defendant's first set of discovery requests with some of his medical records and claimed that he had suffered neck and back pain from the auto accident. *See* SSUF ¶ 81; AR ¶ 40. In those discovery responses, Plaintiff did not claim that the auto accident aggravated the pain or discomfort he experienced from his cancer treatment. *See* SSUF ¶ 82. Defendant's staff counsel ultimately deposed Plaintiff on April 1, 2019. *Id.* ¶ 85.

On January 13, 2019, Defendant's staff counsel rejected Plaintiff's proposed list of arbitrators and proposed three alternative retired judges. *See id.* ¶ 83. On January 14, 2019, Plaintiff's counsel rejected all three arbitrators that Defendant had proposed, and proposed three alternatives. *See id.* ¶ 84. On June 28, 2019, Defendant's staff counsel agreed that Judge Rubin

(ret.) could serve as arbitrator for the matter.  *See id.* ¶ 92.

In the meantime, on June 5, 2019, Dr. Geoffrey Miller conducted an independent medical examination ("IME") of Plaintiff.  *See id.* ¶ 86; AR ¶ 15.  Dr. Miller prepared an IME report and record review report on June 28, 2019, which Defendant received on July 1, 2019.  *See* SSUF ¶ 87.  In his June 28, 2019 IME report, Dr. Miller concluded, among other things, that:  it was difficult or not possible to establish acute signs and symptoms from the accident because Plaintiff did not see his treating doctor until three months after the accident; the medications that Plaintiff was taking cause similar musculoskeletal complaints; Plaintiff's knee complaints were not related to the accident; Plaintiff's low-back injury was not supportable; the cancer drug that Plaintiff was taking was the likely cause of recurrence of Plaintiff's cervical and left-upper extremity complaints; the MRI did not validate Plaintiff's complaints; and the car accident timeline was problematic to establish injury.  *See id.* ¶ 88.

In his IME report, Dr. Miller concluded that the evidence simply did not support a significant injury from the motor vehicle accident.  *See id.* ¶ 89.  In the report, Dr. Miller gave Plaintiff the benefit of the doubt and said that he may have sustained some strains, but nothing more.  *See id.* ¶ 90; *see also* AR ¶ 16.  Dr. Miller also concluded in his report that Plaintiff's injuries had resolved, and that Plaintiff had no permanent impairment or need for future care.  *See* SSUF ¶ 91.

On July 18, 2019, Plaintiff was examined by his own (*i.e.*, not independent) orthopedic expert, Dr. Michael Smith.  *See id.* ¶ 93.  Dr. Smith diagnosed Plaintiff with chronic, symptomatic, posttraumatic injuries to his cervical, thoracic and lumbar spine.  *See id.*  He opined that Plaintiff's neck, left shoulder and back symptoms were a result of the accident and that he could benefit from orthopedic treatment in the form of medication and physical therapy.  *See id.*  Dr. Smith also said that Plaintiff could probably benefit from injections, and that if Plaintiff continued to remain symptomatic, that he *may* have to "consider" surgery.  *See id.*

On November 19, 2019, four months after Defendant had agreed to proceed with Judge Rubin (ret.) as arbitrator, Plaintiff filed a Petition to Compel Defendant to attend UM arbitration.  *See id.* ¶ 94.

On January 14, 2020,[2] Defendant's adjuster Nicholas Duncan reviewed Plaintiff's claim

---

[2] Although the SSUF reports both this date and the date reflected in the next sentence in the text above as having occurred in 2019, both the substance of the supporting declaration (which, as reflected in the following paragraph in the text above, reports reliance on Dr. Miller's June 2019 IME report and criticism of – and a resulting decision *not*

and recommended to Defendant's evaluation consultant that Defendant pay/requested authority to pay $20,000 to $35,000 to settle the claim. *See id.* ¶ 95; AR ¶¶ 17, 33. On January 21, 2020, Defendant's evaluation consultant reviewed the file and disagreed with that settlement recommendation. *See* SSUF ¶ 96. In doing so, the evaluation consultant noted that the IME doctor, Dr. Miller, concluded that if the injuries were related to the accident, the treatment would have been completed by May 3, 2017, when Plaintiff reached maximum medical improvement with physical therapy. *See id.* There was then a 17-month gap before any other complaints concerning Plaintiff's neck and shoulder, which had resolved and which even Plaintiff believed were caused by his new medication. *See id.* However, the evaluation consultant agreed that, even though it did not hinder the treatment he received, Plaintiff's prostate cancer was a value-driver that would gain sympathy. *See id.* As a result, the evaluation consultant assessed general damages of $7,000 to $11,000, with a settlement range of $10,621.44 to $15,121.14. *See id.*; AR ¶ 18; *see also id.* ¶ 35.

In assessing the claim value and settlement value range, Defendant's evaluation consultant relied on Dr. Miller's June 28, 2019 IME report. *See* SSUF ¶ 97; AR ¶ 36. The evaluation consultant did not rely on Plaintiff's hired expert, Dr. Smith, or find Dr. Smith's July 28, 2019 report to be credible, because he noted, among other things, that Dr. Smith did not touch on Plaintiff's prior injuries or treatment other than to say that Plaintiff had surgery 30 years earlier. *See* SSUF ¶ 98. Also, Defendant's evaluation consultant did not find Dr. Smith's report credible because he did not see that Dr. Smith had addressed any of Plaintiff's medical treatment between the surgery and the accident, specifically the treatment that Plaintiff had received just before the loss (including epidural injections). *See id.*

Defendant's evaluation consultant determined that Dr. Miller's IME report, on the other hand, went into detail regarding Plaintiff's status before the loss. *See id.* Given its proximity to the accident, the evaluation consultant considered this to be very crucial. *See id.*

The evaluation consultant also questioned why Plaintiff would seek a report from a doctor that had no involvement with Plaintiff's treatment up to that point, rather than his primary care physician, Dr. Ornelas, who treated Plaintiff before and after the accident, and therefore would have knowledge of any changes in symptoms. *See id.* In addition, Defendant's evaluation

---

to rely upon – Dr. Smith's opinions rendered in July 2019) and the cited exhibit, *see* Docket No. 22-4, at CN170-171, demonstrate that these are typos, and the events referenced actually occurred in 2020, not 2019.

consultant determined that Dr. Smith gave little reasoning for his opinion and his recommendation for future treatment was generic – *i.e.*, Dr. Smith said for Plaintiff to try conservative treatment and if that did not work, they may have to consider surgery (a recommendation that could apply to anyone with back pain). *See id.*

On January 27, 2020, Defendant spoke with Plaintiff's counsel and offered $13,000 to resolve Plaintiff's claim. *See id.* ¶ 99; AR ¶¶ 18, 35. Plaintiff's counsel rejected the offer that same day. *See* SSUF ¶ 100.

On January 28, 2020, Defendant filed an opposition to Plaintiff's Petition to Compel Arbitration. *See id.* ¶ 101. Defendant argued, among other things, that Defendant had not ignored Plaintiff's request for arbitration, that the parties had already agreed to arbitration and an arbitrator, and that they were working to informally schedule an arbitration date. *See id.*

On March 10, 2020, Defendant's staff counsel offered $15,100 to Plaintiff's counsel to resolve Plaintiff's claim. *See id.* ¶ 102. On Plaintiff's behalf, Plaintiff's counsel rejected the offer the next day, and demanded $50,000. *See id.* ¶ 103.

On March 17, 2020, the UM arbitration took place before Judge Shook (ret.). *See id.* ¶ 104; AR ¶ 19. On March 24, 2020, Judge Shook awarded Plaintiff $50,000. *See* SSUF ¶ 105; AR ¶ 19. In his Binding Arbitration Award, Judge Shook found that, while a low-impact accident, the impact was strong enough to cause Plaintiff to suffer pain and strain on his neck, left shoulder and back. *See* SSUF ¶ 106. Judge Shook accepted Plaintiff's explanation for the 90-day delay in seeking treatment and he summarized Dr. Smith's diagnosis and conclusions. *See id.* Judge Shook did not reference Dr. Miller's IME report or opinions in his decision. *See id.* ¶ 107. Defendant received the arbitration award on April 3, 2020, and issued payment on April 8, 2020. *See id.* ¶ 108; AR ¶ 37.

Plaintiff reports experiencing substantial emotional distress caused by what he views as delays in responding to and accepting the demand for arbitration, selecting an arbitrator, and scheduling the arbitration. *See* AR ¶ 14; *see also id.* ¶¶ 11-13. Plaintiff brought suit to recover for economic losses and emotional distress he asserts he suffered as a result of Defendant's conduct. *See id.* ¶¶ 21-22. Plaintiff claims that Defendant's conduct caused him to suffer $6,225.07 in economic damages. *See* SSUF ¶ 109. He claims that all of the records validating his injuries and establishing his right to an award were made known to Defendant as early as February 13, 2018. *See id.* ¶ 110. He also claims that Defendant unreasonably delayed paying

him policy benefits, asserting that Defendant delayed accepting his arbitration demand, agreeing to an arbitrator, taking his deposition, and scheduling arbitration, and forcing him to file a Petition to Compel Arbitration. *See id.* ¶ 111.

### D. Analysis

A cause of action against an insurer for breach of the implied covenant of good faith and fair dealing requires, first, that a benefit be due under the terms of the policy and, second, that the insurer withhold that benefit unreasonably or without probable cause. *See Gruenberg v. Aetna Ins. Co.*, 9 Cal.3d 566, 575 (1973); *Feldman v. Allstate Ins. Co.*, 322 F.3d 660, 669 (9th Cir. 2003); *Anguiano v. Allstate Ins. Co.*, 209 F.3d 1167, 1169 (9th Cir. 2000). "Bad faith" is not synonymous with "negligence." *Guebara v. Allstate Ins. Co.*, 237 F.3d 987, 995 (9th Cir. 2001). An insurer breaches the covenant when it acts in an unreasonable or imprudent manner in discharging its obligations under the contract. *See Crisci v. Security Ins. Co. of New Haven, Conn.*, 66 Cal.2d 425, 430 (1967). In other words, to violate the covenant, the insurer must act unreasonably. *See Morris v. Paul Revere Life Ins. Co.*, 109 Cal.App.4th 966, 973 (2003). "[T]he reasonableness of the insurer's decisions and actions must be evaluated as of the time that they were made; the evaluation cannot fairly be made in the light of subsequent events that may provide evidence of the insurer's errors." *Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co.*, 90 Cal.App.4th 335, 347 (2001). "While the reasonableness of an insurer's claims-handling conduct is ordinarily a question of fact, it becomes a question of law where the evidence is undisputed and only one reasonable inference can be drawn from the evidence." *Id.* at 346; *see also id.* at 347 ("[T]his issue may be resolved as a matter of law in a proper case").

Defendant's first argument in its motion, however, does not address the foregoing elements and/or requirements, but instead asserts that there is an additional, threshold, requirement for a bad faith claim – that the insured have suffered economic/financial loss/damages; indeed, as some authorities have characterized it, *substantial* economic/financial loss/damages. "[E]motional distress damages are recoverable in first and third party insurance bad faith cases only when the plaintiffs have suffered some financial loss." *Maxwell v. Fire Ins. Exch.*, 60 Cal.App.4th 1446, 1447 (1998). "[S]ome financial loss must be shown – to reduce the risk of fictitious claims and those based simply on bad manners, and to avoid litigation over trivialities." *Waters v. United Servs. Auto. Ass'n*, 41 Cal.App.4th 1063, 1074 (1996). *See Gourley v. State Farm Mut. Auto. Ins. Co.*, 53 Cal.3d 121, 128 (1991) (referencing "the threshold

requirement of economic loss"); *id.* at 129 ("Breach of the implied covenant is actionable in the insurance context because such conduct causes financial loss to the insured, and it is that loss which defines the cause of action."); *Pershing Park Villas Homeowners Ass'n v. United Pac. Ins. Co.*, 219 F.3d 895, 904 (9th Cir. 2000) ("California authority subsequent to *Gilchrist* [*v. Jim Slemons Imports, Inc.*, 803 F.2d 1488 (9th Cir. 1986)] clearly holds that a plaintiff may recover damages for all emotional distress incident to an insurer's bad faith denial of coverage, so long as the insurer's conduct also resulted in substantial financial loss."); *Continental Ins. Co. v. Superior Court*, 37 Cal.App.4th 69, 85-86 (1995); *see also* Croskey, Heeseman, Ehrlich & Klee, CAL. PRAC. GUIDE: INSURANCE LITIGATION (The Rutter Group 2020), ¶¶ 13:82-84.5.

Plaintiff does not contest the existence of this requirement. Indeed, his sole citation is to a case that recognizes the rule. *See Major v. W. Home Ins. Co.*, 169 Cal.App.4th 1197, 1215-16 (2009). Instead, he simply asserts that because there is evidence that he incurred attorney's fees and costs in pursuing his claim under the policy when he had to take Defendant to arbitration to achieve what was ultimately a policy-limits recovery, these fees and costs are sufficient loss. *See id.* at 1214 ("[T]he requirement of economic loss for recovery of emotional distress damages may be satisfied where the insured has paid legal fees and court costs to enforce his or her claim under the policy.").

Defendant acknowledges the existence of evidence that Plaintiff incurred $6,225.07. However, Defendant argues that this does not amount to economic *loss* because Plaintiff's last settlement demand before demanding arbitration was for $20,000,[3] *see* SSUF ¶¶ 47-48 and AR ¶¶ 7, 23, and after succeeding at arbitration Plaintiff recovered $50,000, *see* SSUF ¶¶ 105, 108 and AR ¶¶ 19, 37, *i.e.*, $30,000 *more* than he had last demanded before proceeding down the arbitration path and $23,774.93 *more* than that $20,000 demand plus the $6,225.07 he incurred in attorney's fees and costs. As a result, under Defendant's approach to the economic/financial loss issue, Plaintiff "recovered more money as a result of [Defendant's] alleged conduct, [meaning that Plaintiff] cannot show that he suffered net economic damages." Docket No. 21, at 23:7-9.

Defendant supports this approach via a discussion, in detail, in its Reply brief, of *Chandna v. Allstate Ins. Co.*, No. CV 00-7856 FMC-(MCx), 2001 WL 578250, *2-3 (C.D. Cal. May 21, 2001). In *Chandna*, another uninsured-motorist case, the plaintiff demanded $65,000

---

[3] There is also evidence that Plaintiff demanded $50,000 less than a week before the arbitration hearing itself. *See* SSUF ¶ 103. But by this point in time, all of the delays Plaintiff complains about had already occurred.

about one month before arbitration, and ultimately recovered $100,000 (the policy limits) as a result of the arbitration (less $5,813 the defendant insurer had previously paid). *See id.* at *1. Because the plaintiff had to go to arbitration to recover his policy benefits, the amount he owed under his contingency arrangement with his attorney increased by $4,709. *See id.* In addition, he had to pay $835 in arbitration-related costs. *See id.*

The district court summarized the California case law on this point, and then presented the take-aways from that case law as follows:

> Two fundamental principles emerge from a reading of these cases: first, the cause of action is one grounded in property loss, not personal injury; and second, the plaintiff must demonstrate *financial* loss. The Court finds it significant that the cases do not hold that a plaintiff must have experienced some out-of-pocket expenditure, or must have incurred a liability. The cases require a loss.

*Id.* at *2. Under the facts of the case, the court ruled – at the summary judgment stage – that the plaintiff could not prevail, adopting the same net-loss approach Defendant argues for here:

> Had Defendant accepted his highest settlement demand, Plaintiff would have obtained a net recovery of $39,340 ($65,000 less $19,500 in fees, $103 in costs and $5,057 in medical expenses). Plaintiff's net recovery after the arbitration was $55,226. Even considering interest that could have been earned on his settlement award, Plaintiff did not incur financial loss as a result of Defendant's refusal to settle the case.

*Id.* at *3. If *Chandna* is correct in setting forth the appropriate analysis, Plaintiff's claim fails at this threshold point.

Defendant cited *Chandna* in its opening brief (though it did not engage in a sustained discussion/comparison of it until its Reply). Plaintiff did not address it in his Opposition brief at all. Instead, he simply asserted that "Defendant does not and cannot cite any case law stating that these damages alleged by Plaintiff are insufficient." Docket No. 26, at 5:26-27. As *Chandna* demonstrates, Plaintiff is incorrect in that regard. While Plaintiff also asserts that "[t]he argument that Plaintiff mathematically benefitted by [Defendant's] bad faith foot-dragging takes for granted that the true value of Plaintiff's claim is the initial $20,000.00 offer, and not the $50,000.00 that was ultimately awarded," *id.* at 6:5-7, *Chandna* looked to *the amount demanded*, not any conception of "true value."

Defendant does not dispute that, at least under some circumstances, payment of legal fees and court costs can supply the necessary economic loss. It also did not address *Major* – which post-dated *Chandna*, and is a California Court of Appeal decision – in its Reply brief, so the

Court has not received an explanation why the $6,070 fees incurred pre-trial in that case, *see* 169 Cal.App.4th at 1207, were sufficient, but those incurred here were not. Perhaps it is because there appears to have been, in that case, no equivalent pre-litigation settlement demand followed by an ultimate recovery that meant the fees led to no net-loss.

It appears that the California Court of Appeal simply may not have ever directly addressed a dispute concerning whether a *net* loss is required when an insured recovers more by way of arbitration than demanded or offered pre-arbitration. *See also Fleming v. Safeco Ins. Co.*, 160 Cal.App.3d 31, 36, 38 (1984) (reflecting an *insurer-defendant's* argument that the plaintiff's "financial loss consisted of costs and an increase in the attorney's contingent fee, all totalling [*sic*] $1,528.32" where the insurer had offered $10,000 to settle and plaintiff recovered $15,000 policy limit as a result of arbitration). Into that apparent gap falls *Chandna*. In attempting to predict how the California courts would address this issue of California law (as is a federal court's obligation, *see, e.g.*, *Kohler v. Inter-Tel Techs.*, 244 F.3d 1167, 1171 (9th Cir. 2001)), *Chandna*'s reasoning seems to make good sense – far from suffering a *loss* as a result of Defendant's refusal to accede to Plaintiff's $20,000 demand and any "delays" that Defendant may or may not have been responsible for, Plaintiff appears to have *gained* (and ultimately received all that he could have under his policy). If a loss is required, it does not appear to have occurred here.

Following *Chandna*, Plaintiff's bad faith claim – indeed, his entire case, considering it presents only that single claim – cannot proceed. Without a claim, Plaintiff has no basis to seek punitive damages. *See Continental Ins.*, 37 Cal.App.4th at 86 ("If an essential element of plaintiffs' bad faith claim (i.e., economic loss) cannot be shown, then there would be no viable tort action and thus no basis for an award of punitive damages."). Summary judgment in Defendant's favor is warranted. There is no apparent need to address the other issues Defendant's motion raises.

### III. Conclusion

For the above stated reasons, the Court grants Defendant's motion for summary judgment.